

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew' s Plaza*
*New York, New York  10007*

February 11, 2008

BY HAND

Honorable Denny Chin
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re: United States v. Delvis Vargas
       08 Civ. 97 (DC)
       02 Cr. 1388 (HB)

Dear Judge Chin:

   The Government respectfully submits this letter in response
to the pro se motion by Delvis Vargas, filed on January 7, 2008,
for return of property seized from him by the Federal Bureau of
Investigation.  Pursuant to Rule 41(g) of the Federal Rules of
Criminal Procedure, Vargas seeks the return of (1) personal
property including a Casio watch, an earing, and other
miscellaneous items seized from him on October 2, 2002, the date
of his arrest; and (2) $3,400 seized from a van he was driving
with co-defendant Luis Morant-Cordero when the FBI stopped the
van, on September 18, 2002.  *See* Vargas Motion for Return of
Personal Property and For Injunctive Relief, at 2.  The
Government has no objection to the return of the personal items
seized from him at the time of his arrest.  With respect to the
$3,400 seized, however, the Government respectfully submits that
Vargas is entitled to the return of $1,400 and his co-defendant
Morant-Cordero is entitled to the return of the remaining $2,000.

## 1. **Background**

   Delvis Vargas, a/k/a "Pedro Carvajal," and two co-defendants
were charged in Indictment 02 Cr. 1388 (HB) on October 24, 2002

Honorable Denny Chin
February 11, 2008
Page 2

(the "Indictment").  Count One of the Indictment charged Vargas,
Domingo Gaton, a/k/a "Antonio Carro," and Luis Morant-Cordero,
a/k/a "Luis Moran Cordero," with conspiring to distribute and
possess with intent to distribute 50 grams and more of crack
cocaine, in violation of Title 21, United States Code, Section
846.

     The trial of Vargas began on March 3, 2003.  On March 6,
2003, the jury convicted Vargas of Count One of the Indictment.
On August 7, 2003, the Honorable Harold Baer, Jr., sentenced
Vargas to a term of 121 months' imprisonment, to be followed by a
five-year term of supervised release, and a mandatory $100
special assessment.[1]  Vargas's conviction and sentence were
affirmed by the Second Circuit Court of Appeals in United States
v. Gaton, 03-1422 (L), 03-1489 (CON), 2004 U.S. App. LEXIS 10238
(2d Cir. May 25, 2004).

**2.    Applicable Law**

     Rule 41(g) "provides a method for return of seized property
and suppression of evidence in a criminal case." Onwubiku v.
United States, 969 F.2d 1392, 1396 (2d Cir. 1992). Once the
criminal proceedings have concluded, Rule 41(g) has no further
application.  Id. at 1396-97 ("[a]fter the case is concluded, a
property owner may have other rights under statutory or common
law for return of property wrongfully seized, but he has no such
right under [Rule 41(g)] after conviction") (collecting cases).
Nonetheless, with respect to motions filed by pro se litigants,
the Second Circuit Court of Appeals has made clear that "[w]here

---

     [1]     On December 22, 2004, Morant-Cordero pleaded guilty to
Count One of the Indictment.  On May 19, 2005, Judge Baer
sentenced Morant-Cordero to a term of 120 months' imprisonment,
to be followed by a five-year term of supervised release, and a
mandatory $100 special assessment.

          On February 25, 2002, Gaton pleaded guilty to Counts
One and Two of the Indictment.  On June 26, 2003, Judge Baer
sentenced Gaton to concurrent terms of 120 months' imprisonment
on Counts One and Two, to be followed by a five-year term of
supervised release, and a mandatory $200 special assessment.

Honorable Denny Chin
February 11, 2008
Page 3

criminal proceedings against the movant have already been
completed, a district court should treat a rule 41(e) motion as a
civil complaint."  Onwubiku v. United States, 969 F.2d at 1397;
see also Mora v. United States, 955 F.2d 156, 158 (2d Cir. 1992)
("where no criminal proceedings against the movant are pending or
have transpired, a motion for the return of property is 'treated
as [a] civil equitable proceeding[] even if styled as being
pursuant to Fed. R. Crim. P. 41(e)'") (quoting United States v.
Martinson, 809 F.2d 1364, 1367 (9th Cir. 1987)).

3.   **Argument**

   a.   **Summary**

      Vargas claims that he is entitled to $3,400 seized from the
van in which he and co-defendant Morant-Cordero were riding on
September 18, 2002, when the van was stopped and searched by the
FBI.  After a review of the trial testimony and statements made
to law enforcement by each defendant, the Government submits that
Vargas entitled to the return of $1,400 and his co-defendant
Morant-Cordero is entitled to the return of the remaining $2,000.

      As discussed in detail below, testimony at trial established
that there was a total of $5,400 recovered from the van that
Vargas and Morant-Cordero were riding in on September 18, 2002.
Of the $5,400, $1,000 was recovered from Vargas's pants pocket,
$2,880 was recovered from the glove compartment of the van, and
$1,520 was recovered from underneath the front passenger seat
where Morant-Cordero was seated.  Of this $5,400, $2,000 was the
Federal Bureau of Investigations's pre-recorded "buy" money used
by the confidential informant, working at the direction of the
FBI, in the narcotics transaction for which the defendants were
convicted.  Therefore, $3,400 remains to be returned to the
defendants.

      The Government's proof established that, on September 18,
2002, Domingo Gaton, Delvis Vargas and Luis Morant-Cordero sold
68 grams of crack cocaine to a confidential informant ("CI")
working with the Federal Bureau of Investigation ("FBI"). This
drug deal took place outside La Caridad Restaurant in Washington
Heights and was surveilled and taped by FBI agents and New York
City Police Department ("NYPD") detectives who were members of an
FBI narcotics task force. Gaton negotiated the crack sale with
the CI and gave the crack to the CI in front of the restaurant.
Morant-Cordero supplied the crack. Vargas, together with Morant-

Honorable Denny Chin
February 11, 2008
Page 4

Cordero, delivered the crack to Gaton and received $2,000 in
proceeds from the sale. The evidence at trial amply demonstrated
that Vargas knowingly participated in the conspiracy to sell
crack cocaine to the CI on September 18, 2002. The evidence
showed that while Gaton and the CI met in front of La Caridad
Restaurant, Vargas and Morant-Cordero arrived in a white van
driven by Vargas to deliver the crack cocaine. The 68 grams of
crack were stored inside a loaf of bread that was on the floor in
between the front seats of the van. Once Vargas arrived at La
Caridad, he parked the van in front of the restaurant. Gaton
obtained the crack from the van and then gave it to the CI in
exchange for $2,000 in pre-recorded buy money. The van that
Vargas was driving was followed and later stopped. A search of
the van discovered the entire $2,000 of pre-recorded buy money
inside the van.

After the $5,400 — including the $2,000 of the FBI's pre-
recorded "buy" money — was seized, Vargas made several attempts
to get the money back from law enforcement officers over the next
few weeks. In doing so, Vargas made very different statements to
law enforcement about the source and the amount of money seized.
In all of Vargas's statements, he claimed — falsely — that the
FBI's pre-recorded "buy" money was money that Vargas possessed
prior to the drug delivery.

    **b.**   **<u>Trial Testimony</u>**

In August and September 2002, Gaton told the confidential
informant, who was working with the FBI, that he could sell crack
cocaine to the CI. (Tr. 27).[2] A meeting was scheduled between
Gaton and the CI, at which the CI was going to purchase crack
cocaine from Gaton. (Tr. 29). Law enforcement agents surveilled
and monitored the meeting, which took place on September 18,
2002, in front of La Caridad Restaurant on Amsterdam Avenue near
164th Street. (*See* Tr. 32-36, 75-85). The meeting was audiotaped
by the CI, who wore a body wire (Tr. 33; GX 8, 8-R, 8-TR-R), and
was also videotaped by the law enforcement officers. (Tr. 76, 80-
85; GX 7).

The drug deal took place between approximately 6:16 p.m. and

---

    [2]    "Tr." refers to the transcript of the trial in the
underlying criminal case, 02 Cr. 1388 (HB); "GX" refers to
exhibits introduced by the Government at trial in that case.

Honorable Denny Chin
February 11, 2008
Page 5


6:48 p.m. (GX 8, GX 8-TR). At approximately 6:00 p.m., before the
deal, Special Agent Jason Demartino of the FBI gave the CI $2,000
of pre-recorded U.S. currency to use to purchase the crack
cocaine from Gaton. Demartino had xeroxed each of the bills and
initialed and dated the copies prior to giving the money to the
CI. (Tr. 31). After that, the CI went to La Caridad Restaurant,
and met with Gaton. (Tr. 76). Gaton told the CI during the
meeting that the crack he sells is "great stuff" (GX 8-R-TR at
2), and that "these people that cook it for me . . . don't add
cut to it." (GX 8-R-TR at 3).

      As Gaton and the CI were waiting in front of the restaurant
for the delivery of the crack, Gaton told the CI, "Let me call
these people there." (GX 8-R-TR at 7). While on the phone, Gaton
said, "Which way are you guys coming?" (GX 8-R-TR at 7). After
this call concluded, Gaton told the CI several times that he only
does business with people he knows and trusts. Gaton said, "I
have my people, you know, I'm comfortable, relaxed." (GX 8-R-TR
at 7). Later, Gaton told the CI again, "I do business with very
few people but when I do, I do it well, because what people
always do is deceive one another." (GX 8-R-TR at 8). Gaton then
received a call from Morant-Cordero. Gaton said, "I've been
outside here, at El Caridad." (GX 8-R-TR at 8). After that
conversation, Gaton told the CI, "he's a serious guy, . . . I
like doing business with him." (GX 8-R-TR at 9). Later, Gaton
advised the CI, "don't do business with strange people." (GX 8-R-
TR at 10).

      Gaton made several telephone calls from his cell phone while
standing in front of the restaurant. (GX 7; Tr. 77). Between 6:14
p.m. and 6:35 p.m. alone, which included the time that Gaton was
meeting with the CI at La Caridad, Gaton and Morant-Cordero
called each other approximately seven times. (GX 32). Morant-
Cordero and Vargas called each other approximately eleven times
on September 18, 2002. (GX 32).[3] The last call between Morant-
Cordero and Vargas was at 5:52 p.m., indicating that the two men
were together in the van at the time Gaton was speaking to
Morant-Cordero from in front of La Caridad. (GX 32).

      When Gaton and the CI were meeting, Vargas, accompanied by
Morant-Cordero, arrived at La Caridad Restaurant in a white van.

---

      [3]    Vargas's cell phone was subscribed in the name of
Lydia Nunez. (Tr. 57; GX 6).

Honorable Denny Chin
February 11, 2008
Page 6

Vargas double-parked the van on the street in front of the
restaurant, directly in front of the location where Gaton and the
CI were standing on the sidewalk. (Tr. 40, 77, 87; GX 7). The
van's hazard lights were activated. (Tr. 77). Vargas was in the
driver's seat and Morant-Cordero was in the passenger's seat.
(Tr. 40, 87). The hollowed-out loaf of bread containing the crack
cocaine was on the floor in between Vargas and Morant-Cordero.
(Tr. 41; GX 15A, GX 15B, GX 15C).

     Soon after Vargas and Morant-Cordero arrived, Gaton entered
the van. New York City Police Detective Isaias Colon, assigned to
the FBI Task Force, was monitoring the meeting from a car that
was parked across the street from La Caridad. Detective Colon,
who was equipped with binoculars (Tr. 76), could see inside the
van though the front windshield window. (Tr. 80). When Gaton was
inside the van, Detective Colon, using his binoculars, observed
the driver and the passenger reaching down into the center area
between the two front seats, and saw the driver's arms reaching
into that center area. (Tr. 77-78, 84, 108-09). This is the
location where the hollowed-out loaf of bread was later found.
(Tr. 41, 140).

     A short time later, Gaton exited the van and re-joined the
CI on the sidewalk in front of the restaurant. (GX 7). Gaton and
the CI then went inside La Caridad. Once inside, Gaton gave the
CI a brown paper bag containing approximately 68 grams of crack
and the CI gave Gaton the $2,000 of pre-recorded U.S. currency.
(GX 4, GX 5, GX 7, GX 8, GX 8-TR-R at 11). Vargas and Morant-
Cordero waited in the van in front of the restaurant. (GX 7).

     After the drug deal was concluded, Gaton re-entered the van
and Vargas drove away. (GX 7; Tr. 85-86). Gaton got out of the
van a few minutes later in the vicinity of 165th Street. (Tr.
86). Vargas continued to drive northbound in upper Manhattan.
(Tr. 38, 137). Deciding to stop the van, agents in the lead car
in the surveillance put on their lights and sirens and attempted
to pull over Vargas. (Tr. 38, 137). Vargas tried to elude the
agents and drove through four or five traffic lights. Vargas
finally stopped when the van got stuck in traffic in the vicinity
of 186th Street. (Tr. 38, 138).

     Vargas and Morant-Cordero were detained and taken to the
33rd Precinct, where they were searched and interviewed. (Tr. 39-
40). A search of Vargas revealed $1,000 in cash in one of his
pockets. (Tr. 139). Agents searching the van found the hollowed-

Honorable Denny Chin
February 11, 2008
Page 7

out loaf of bread on the floor in between the front seats and
$4,400 in cash. (Tr. 41, 140; GX 15A, GX 15B, GX 15C). Of the
$4,400, $2,880 was found in the glove compartment and $1,520 was
found under the front passenger seat. (Tr. 41, 140). All $2,000
of the FBI's pre-recorded "buy" money that had been used by the
CI to purchase the crack was recovered from Vargas's van. (Tr.
44-45; GX 2).

That night, September 18, 2002, Vargas told the agents that
all of the money in the van was his and that he had earned it
from his job at a grocery store. (Tr. 122). Vargas also said that
he did not know the names of the people who were in the van with
him that night but that they were his friends. (Tr. 123).
Moreover, on September 18, Vargas did not have any identification
in his true name. (Tr. 53).

When agents separately interviewed Morant-Cordero that
night, Morant-Cordero told them that $2,000 of the money seized
from the van was his. (Tr. 124-25).

Vargas and Morant-Cordero were released that night and the
investigation continued. (Tr. 40-41). However, all $5,400 found
in the van and on Vargas was seized by the FBI. On September 18,
2002, Vargas was given a receipt, which he signed, for the
$5,400. (Tr. 88-89; GX 11).

Thereafter, in an effort to reclaim the $5,400, Vargas made
three additional statements to the NYPD regarding the source of
the funds, all of which conflicted with one another and with the
statement he made on the night of September 18, 2002, and all of
which falsely represented, among other things, that Vargas had
been in possession of the FBI's pre-recorded "buy" money prior to
the drug deal.

First, during the early morning of September 19, 2002,
Vargas contacted the Internal Affairs Bureau ("IAB") of the NYPD.
Vargas told Sgt. Joseph Tetonic of the NYPD Internal Affairs
Bureau that $6,000 — not $5,400 — was taken from him by officers
during the stop. (Tr. 127-28). Vargas claimed that of the $6,000
seized, $5,000 belonged to him and $1,000 was a loan from
"Hamilton." He said that he did not know Hamilton's last name but
knew him from a gym. (Tr. 128). Vargas claimed that he (Vargas)
worked in a minimart near the corner of Academy and Vermilya in
Washington Heights and that Hamilton also used to work there.
(Tr. 128). This statement was false; although there are three

Honorable Denny Chin
February 11, 2008
Page 8

grocery stores near the corner of Academy and Vermilya in
Washington Heights, Vargas had not worked in any of them. (Tr.
191-92, 196, 200). During the meeting, Vargas gave Sgt. Tetonic a
bank receipt dated in July that showed a $5,000 withdrawal.
Vargas also claimed that, although he was unemployed, he was
going to use the money to buy a motorcycle. (Tr. 128-29).

     Next, on September 24, 2002, Vargas went to the 33rd
Precinct to meet with Detective Colon in an effort to claim the
money seized from his van. (Tr. 90). At this meeting, Vargas yet
again made different statements about the amount and the source
of the money. Vargas gave Detective Colon a copy of a Citibank
withdrawal slip from the account of a man named Jose Paulino, who
Vargas said was his cousin. Vargas claimed that the withdrawal
slip showed that the money found in the van belonged to Vargas.
(GX 12; Tr. 90-91). The document showed a $5,000 withdrawal on
July 27, 2002 — two months earlier — from Paulino's account. (GX
12). Vargas told Detective Colon that he had saved the money from
his job in a grocery store. (Tr. 91). On September 24, Vargas
provided Detective Colon with a written statement in which he
claimed that $5,500 was taken from him on September 18 and that
all of the money was his own. (GX 13, 13A; Tr. 92).

     Finally, on October 2, 2002, Vargas went to the 33rd
Precinct again in another effort to recover the money. (Tr. 46-
50, 95-98). Vargas brought Morant-Cordero with him. Vargas and
Morant-Cordero each met with Detective Colon and Special Agent
Demartino. Vargas told them that he wanted to pick up the $5,400
and that all of the money was his. This time, Vargas said that
his friend Hamilton had given him $2,000 of the $5,400 and the
rest represented Vargas's earnings from his job. (Tr. 47-48, 96-
97).

     The agents separately interviewed Morant-Cordero on October
2, 2002. Morant-Cordero told them that Vargas called him on
September 18 and asked to borrow $2,000. Morant-Cordero agreed to
loan it to him. (Tr. 97). Morant-Cordero said that Vargas picked
him up on September 18 at 2:00 p.m., and as soon as Morant-
Cordero got into Vargas's van, Morant-Cordero put the $2,000 into
the glove compartment. (Tr. 97-98). Morant-Cordero said that the
$2,000 he loaned to Vargas represented Morant-Cordero's own
earnings from his job at a grocery store. (Tr. 98).

     Vargas and Morant-Cordero were arrested at the 33rd Precinct
on October 2, 2002. (Tr. 50). That same day, Gaton was also

Honorable Denny Chin
February 11, 2008
Page 9

arrested. (Tr. 53).

Vargas called no witnesses at trial, and the only evidence he presented was a stipulation between the parties that the owner of the drugs was Morant-Cordero. (Tr. 146).

   c.   **Discussion**

By letter dated August 28, 2007, the FBI notified Vargas and Morant-Cordero about the property seized in connection with the case and gave them each 30 days to claim the property. With respect to the $3,400 recovered from the van in which both defendants were driving on September 18, 2002, each defendant claimed that the entire amount of money belonged to him.

The FBI then sent Vargas and Morant-Cordero letters dated November 29, 2007, stating that on the basis of the evidence, $1,400 should be returned to Vargas, and $2,000 should be returned to Morant-Cordero. (*See* Letters from Supervisory Special Agent Jason Demartino, dated November 29, 2007, attached as Exhibit A). Morant-Cordero agreed to accept $2,000 (*see* Morant-Cordero Letter and Indemnity Agreement, dated December 4, 2007, attached as Exhibit B). However, Vargas continues to claim that the entire $3,400 belongs to him.

On the basis of the evidence elicited at trial, the Government respectfully submits that Vargas is entitled to $1,400, and Morant-Cordero is entitled to $2,000, of the $3,400 seized from the van. As set forth above, of the $5,400, $1,000 was recovered from one of Vargas's pants pockets, (Tr. 139), $2,880 was found in the glove compartment and $1,520 was found under the front passenger seat. (Tr. 41, 140). (However, $2,000 of this cash was the FBI's pre-recorded "buy" money that had been used by the CI to purchase the crack from Vargas and Morant-Cordero. (Tr. 44-45; GX 2)).

On the night of the seizure of the cash, Vargas, using the fake name "Pedro Carvajal," told the agents that all of the money in the van was his. (Tr. 122), whereas Morant-Cordero told them that only $2,000 of the money seized from the van was his. (Tr. 124-25).

After the money was seized, Vargas made three additional statements to the NYPD regarding the cash, all of which conflicted with one another and with the statement he made on the

Honorable Denny Chin
February 11, 2008
Page 10

night of September 18, 2002. *See* pp. 7-8 above. Furthermore, Vargas continued to use a fake name and to falsely claim on several occasions that the FBI's pre-recorded "buy" money was also his and that he had possession of the "buy" money prior to the drug deal — assertions which were plainly lies. *Id*. Morant-Cordero, however, consistently told law enforcement agents – on the night the cash was seized and at the time of his arrest – that $2,000 of the $5,400 seized from the van was his. (*See* Tr. 124-25; Tr. 97-98). Cordero's statements about the cash are corroborated by Vargas's own statements to law enforcement (made on October 2, 2002), when he told agents that Morant-Cordero had given him $2,000 on the same day that the cash was seized. (Tr. 47-48, 96-97).

Therefore, the Government respectfully submits that the evidence at trial shows that Vargas is entitled to the return of $1,400 and his co-defendant Morant-Cordero is entitled to the return of the remaining $2,000.

With respect to Vargas's personal property listed in the FBI voucher dated October 2, 2002 and signed Vargas using the name "Pedro Carvajal," (attached as Exhibit C), the FBI will release this property by making it available for pickup by a person designated by the defendant.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

By: _____
    LISA A. BARONI
    Assistant United States Attorney
    (212) 637-2405

cc: Delvis Vargas, Reg. # 51659-054
    FCI Ray Brook
    P.O. Box 9007
    Ray Brook, NY 12977
    *(By Mail)*